# AFFIDAVIT

I, Christopher May, being duly sworn, depose and state as follows:

## INTRODUCTION AND AGENT BACKGROUND

1.      I make this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a search warrant authorizing the examination of property -- an electronic device -- which is currently in law enforcement possession, and the extraction from that property of electronically stored information described in Attachment B.

2.      I am a Task Force Officer (TFO) with the Drug Enforcement Administration (DEA), assigned to the DEA's Burlington Resident Office (BRO). I was deputized as a federal TFO pursuant to Title 21, United States Code, Section 878 on May 3, 2018, and I am designated by the Attorney General, through approved delegations of authority, to execute and serve search warrants and arrest warrants issued under the authority of the United States. I am currently employed with the Essex Police Department and have been since 2009. Presently, I am assigned to the Detective Bureau. I completed the Basic Training Course at the Vermont Police Academy and graduated in 2006. I have attended specialized trainings dealing with drug investigations and drug trafficking, including the DEA basic narcotic investigation school. I have been involved in numerous drug investigations leading to the arrest and prosecution of subjects. I have participated in the execution of numerous search warrants leading to the recovery of controlled substances. I have written affidavits in support of search and arrest warrants, and I frequently use informants and other confidential sources of information. In the course of my work, I have gained an understanding of current technology, including smartphones, for the purpose of investigating drug-related crimes.

1

3. The property to be searched is a cellular telephone (Target Device 1) associated with Sonya WOOD. As described below, there is probable cause to believe that in the spring of 2021, Sonya WOOD distributed, possessed with intent to distribute, and conspired to distribute and/or possess with intent to distribute controlled substances, including methamphetamine, a schedule II controlled substance, in violation of 21 U.S.C. §§ 841(a) and 846, and that Target Device 1 constitutes an instrumentality of those crimes and contains evidence of those crimes.

4. The information contained within this affidavit is based upon my own training, experience, and investigation, as well as information conveyed to me by other law enforcement officers. Because this affidavit is being submitted for the limited purpose of securing the requested warrant, I have not included every fact known to me concerning this investigation.

## IDENTIFICATION OF THE DEVICE TO BE EXAMINED

5. Target Device 1 is a Motorola telephone with a white back. Target Device 1 is currently in the custody of the Williston, Vermont Police Department.

6. The applied-for warrant would authorize the forensic examination of Target Device 1 for the purpose of identifying electronically stored data particularly described in Attachment B.

## PROBABLE CAUSE

### Stolen Property Investigation and Seizure of Backpacks

7. I learned the following information from Williston Police Officer Richard Greenough as well as from my review of documents related to this investigation. On April 18, 2021, at approximately 3:15 AM, Williston Police responded to 74 Chelsea Place in the town of Williston for a report of the resident who had observed a male and a female on a video surveillance camera. The resident, who identified himself, advised dispatch that he received an

2

alert on his web cam and saw two people, a male and a female, in the area of his residence. The resident further advised that he observed a female who was wearing what he thought was a raincoat and carrying a backpack.

8. Williston Police Officers Greenough and John Hamlin arrived in the vicinity of Chelsea Place shortly thereafter and met with Sonya WOOD and Ryan LAFLIN at 30 Chelsea Place in Williston, Vermont. LAFLIN and WOOD are both known to Officer Hamlin through previous law enforcement contact. WOOD and LAFLIN were asked if they were staying at 30 Chelsea Place, and WOOD responded by saying that she and LAFLIN were staying at the Home 2 Suites hotel in Williston. WOOD offered to show a confirmation reservation, which was on her phone. WOOD thought her phone was in a gray L.L. Bean brand backpack, which was partially tucked under a vehicle parked in the driveway of the residence located at 30 Chelsea Place. A second backpack, a black Oakley brand backpack, was also found partially tucked under the same vehicle. The clothing worn by WOOD matched that of the description provided by the resident at 74 Chelsea Place.

9. Officer Greenough asked for consent to search the backpacks for stolen property. WOOD deferred to LAFLIN, claiming the backpacks were his, and LAFLIN subsequently denied consent. Both backpacks were seized by Officer Greenough, and WOOD was cited for a condition of release violation.[1]

10. Once LAFLIN and WOOD were released, Officer Greenough returned to Chelsea Place to conduct a canvas of the area to see if other items had been stolen. Officer Greenough,

---

[1] On March 29, 2021, conditions of released were imposed on WOOD in Vermont state court. These conditions of release stem from 16 counts of identity theft, two violations of conditions of release, nine counts of fraudulent possession of a credit card, possession of heroin, and possession of methamphetamine. These charges remain pending in Vermont state court.

3

through further investigation, observed two open, Adidas brand shoe boxes on the ground in the area around 74 and 78 Chelsea Place. Officers also observed that 78 Chelsea Place had its garage door open and a vehicle parked in the garage. 78 Chelsea Place also had a security camera pointed toward the driveway.

11. The resident at 78 Chelsea Place later advised other Williston Police Department officers that two pairs of Adidas sneakers and a cell phone had been taken from his vehicle. The resident also provided video footage of WOOD and LAFLIN entering the garage of 78 Chelsea Place wearing backpacks. Officer Greenough reviewed this video and observed WOOD was in possession of the gray L.L. Bean brand backpack.

12. When Officer Greenough examined the gray L.L. Bean brand backpack, he observed what appeared to be the sole of a shoe through an opening in the backpack. This sole was consistent with the type of shoes reported stolen from the resident at 78 Chelsea Place.

### Search of L.L. Bean Brand Backpack and Seizure of Methamphetamine

13. On April 23, 2021, Officer Greenough applied for and was granted a State of Vermont search warrant for the aforementioned backpacks. Also on April 23, 2021, Officer Greenough executed the warrant and located suspected methamphetamine within the gray L.L. Bean brand backpack. Officer Greenough showed me four knotted bags, one plastic pouch, and a plastic container, each of which contained a white crystalline substance. I weighed the four knotted bags, the plastic pouch, and the plastic container, which yielded a collective aggregate weight of approximately 152.6 grams. I conducted a field test on the substances contained within each of the four knotted bags, the plastic pouch, and the plastic container, and each field test yielded a positive indication for the presumptive presence of methamphetamine. Officer Greenough advised the suspected methamphetamine was seized from the gray L.L. Bean brand

4

backpack. The gray L.L. Bean brand backpack also contained WOOD's Vermont-issued photographic identification, $876.00 in U.S. currency, and Target Device 1 (a Motorola telephone).

14. Based on my training and experience, as well as my participation in this investigation, I believe that the quantity of methamphetamine seized and the manner in which it was packaged are consistent with distribution rather than personal use. In addition, I believe the presence of $876.00 in U.S. currency further suggests that WOOD and LAFLIN were engaged in selling methamphetamine.

### Prior Interview with Sonya WOOD (May 2020)

15. Previously, on May 11, 2020, Special Agent Kevin Kadish and TFO Dwayne Mellis of the DEA BRO and other law enforcement officers conducted an interview with Sonya WOOD at the Rutland (Vermont) Police Department. I have reviewed a report of this interview. WOOD had been arrested by Rutland City Police Detective Emilio Rosario, and she agreed to waive her *Miranda* rights and speak with law enforcement. Detective Rosario advised SA Kadish and TFO Mellis that WOOD had approximately nine grams of suspected methamphetamine at the time of her arrest.

16. During the interview, which was recorded, WOOD advised, among other things, that she purchased methamphetamine from Andrew GOODMAN.[2] WOOD said that GOODMAN sold "8 balls," which, based on my training and experience, commonly refers to 3.5 gram quantities, of methamphetamine for $200, whether WOOD purchased one at a time or four

---

[2] On December 28, 2020, Andrew GOODMAN appeared before U.S. District Court Judge Christina Reiss, in the District of Vermont. At that time, GOODMAN pled guilty to Possession with Intent to Distribute 500 grams or more of a mixture and substance containing methamphetamine.

5

at a time. WOOD stated that GOODMAN's phone number was 802-353-6084. WOOD also stated that she used Facebook Messenger to contact GOODMAN to arrange the purchase of methamphetamine.

17. WOOD also allowed law enforcement to review the contents of her cellular device. Among other communications, law enforcement reviewed several Facebook Messenger conversations between WOOD and a Facebook Messenger user who WOOD identified as GOODMAN on WOOD's cellular phone. Some of those communications are referenced in the following paragraphs.

18. For example, WOOD and GOODMAN had the following Facebook Messenger communication dated May 7, 2020:

| | |
|---|---|
| WOOD: | I need 3 bs plz. |
| GOODMAN: | Ok |
| GOODMAN: | Leaving now |
| GOODMAN: | I'm at mcds…? |
| GOODMAN: | Don't see you will have to catch you on the way back |
| WOOD: | I'm at people's united |
| WOOD: | Can you swing by herr |

19. Based on my training, experience, and knowledge of this investigation, I believe this is a drug-related conversation. WOOD asked GOODMAN for "3 bs" which I understand to mean three balls of methamphetamine.

20. Additional Facebook Messenger communications between WOOD and GOODMAN took place on Saturday, May 9, 2020. WOOD and GOODMAN appeared to

6

arrange to meet up via Facebook Messenger. Later in the day, after the meeting, they continued to communicate via Facebook Messenger:

| | |
|---|---|
| WOOD: | Did u just get this? It's diff than last |
| GOODMAN: | Same stuff |
| WOOD: | Ok, it just tastes a lil diff could be just me lol |
| GOODMAN: | Is it just at first then goes away? |
| WOOD: | Yeah |
| GOODMAN: | Shit I probably had K on my finger when I weighed that out |
| WOOD: | Lol |
| WOOD: | What does that do to u?? Lmao never done it |

21. Based on my training, experience, and knowledge of this investigation, I believe this conversation between GOODMAN and WOOD is a drug-related conversation, and my understanding of this conversation is that WOOD had purchased methamphetamine from GOODMAN. However, the methamphetamine WOOD most recently purchased from GOODMAN tasted different than previous methamphetamine GOODMAN supplied. GOODMAN advised that he "probably had K on my finger when I weighed that out." I believe that GOODMAN means that, when he weighed and packaged the methamphetamine he sold to WOOD, he had ketamine (which can be referred to as "K") on his hand, and which may have altered the taste for WOOD. I know that Ketamine is a Schedule III controlled substance.

22. The above conversations and interview demonstrate WOOD previously had used a cellular device to procure and discuss controlled substances, specifically methamphetamine.

7

## ADDITIONAL INFORMATION ABOUT NARCOTICS TRAFFICKERS

23. Based on my training and experience, I know the following:

    a. People who participate in the distribution of controlled substances frequently use cellular telephones, among other devices, to coordinate their unlawful activities and to maintain contact with suppliers and consumers of illegal drugs.

    b. Information stored on these devices constitutes evidence of drug trafficking. Among other things, this evidence may include the telephone numbers assigned to the communication devices, messages received by or sent from the devices, identification numbers and other information contained in their electronic memories, and the records of telephone numbers to which calls were placed and from which calls were received. The device may also contain Global Positioning System (GPS) or other location information indicating where the devices have traveled.

    c. With their cellular phones, drug dealers often take photographs or videos of drugs, drug paraphernalia, other members of their organizations, cash and assets obtained from profits of drug sales, and locations associated with their illegal activity. These photographs or videos may be stored in the memory of a cellular phone.

    d. Data contained in a cellular telephone may reveal the physical location of the cellular telephone at various times. For example, the latitude and longitude of the camera at the time it takes a photograph may be contained in the metadata associated with the photograph. Also, if a cellular telephone has GPS capabilities, which many do, additional information regarding locations of the cellular telephone, while it follows GPS directions, may be recovered from the device.

24. Based on my knowledge and experience and direct participation in investigations into the distribution of controlled substances, I also know that:

   a. Distribution of controlled substances can be lucrative, and individuals who engage in such conduct are capable of amassing tens of thousands of dollars or more in a short period of time and often physically retain such currency for long periods of time, even after their distribution activity has ceased;

   b. It is common for sellers of controlled substances to put bank accounts, assets, and cell phones in the names of associates or under fictitious names to avoid detection and to conceal illegitimate income;

   c. Controlled substance traffickers maintain and access books, records, receipts, bills of sale, notes, ledgers, computer software, airline tickets, money orders, and other records relating to the transportation, acquisition, and distribution of controlled substances and proceeds, and much of this information is commonly stored electronically in cellular telephones and other electronic devices capable of storing electronic data;

   d. People engaged in criminal activity often spend the proceeds of their criminal activity and maintain or access records of their expenditures on their cellular telephones long after their criminal activity has ceased. They also maintain electronic records reflecting communication with their criminal associates. Specifically, these records may include the following:

      i. Records of income and expenses, such as profit and loss statements and income and expense journals that reflect the expenditure of the proceeds of criminal activity;

      ii. Evidence of the expenditure of the proceeds of criminal activity or purchase of assets with the proceeds of criminal activity, such as invoices, receipts, rental

9

statements, lease statements, travel records, earnest money agreements, escrow statements, and real estate deeds;

   iii. Records of the accumulation of assets acquired with the proceeds of criminal activity, such as ledgers, balance sheets and financial statements, reflecting both assets and liabilities;

   iv. Checking and savings account records consisting of monthly statements, duplicate deposit slips, and canceled checks reflecting the deposit and disbursement of the proceeds of criminal activity; and

   v. Drug traffickers frequently take, or cause to be taken, photographs of themselves, their associates, their property, and their product. These traffickers may maintain these photographs electronically in their cellular telephones. I know, based on my training and experience, that unexplained wealth is evidence of crimes including trafficking in controlled substances.

## TECHNICAL TERMS

25. Based on my training and experience, I use the following technical terms to convey the following meanings:

 a. Cellular telephone: a cellular telephone (or mobile telephone, or wireless telephone) is a handheld wireless device used for voice and data communication through radio signals. These telephones send signals through networks of transmitter/receivers, enabling communication with other wireless telephones or traditional "land line" telephones. A cellular telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone. In addition to enabling voice communications, cellular telephones offer a broad range of capabilities. These capabilities include: storing names and

10

phone numbers in electronic "address books;" sending, receiving, and storing text messages and e-mail; taking, sending, receiving, and storing still photographs and moving video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; and accessing and downloading information from the Internet. Most cellular telephones run computer software, giving them many of the same capabilities as personal computers. For example, smartphone users can work with word-processing documents, spreadsheets, and presentations. Cellular telephones may also include global positioning system ("GPS") technology for determining the location of the device.

        b.      GPS: the Global Positioning System (generally abbreviated "GPS") consists of 24 NAVSTAR satellites orbiting the Earth. Each satellite contains an extremely accurate clock. Each satellite repeatedly transmits by radio a mathematical representation of the current time, combined with a special sequence of numbers. These signals are sent by radio, using specifications that are publicly available. A GPS antenna on Earth can receive those signals. When a GPS antenna receives signals from at least four satellites, a computer connected to that antenna can mathematically calculate the antenna's latitude, longitude, and sometimes altitude with a high level of precision. A GPS navigation device uses the Global Positioning System to display its current location. It often contains records of the locations where it has been. Some GPS navigation devices can give a user driving or walking directions to another location. These devices can contain records of the addresses or locations involved in such navigation.

        c.      IP Address: an Internet Protocol address (or simply "IP address") is a unique numeric address used by computers on the Internet. An IP address is a series of numbers and/or letters (e.g., 121.56.97.178). Every computer attached to the Internet must be assigned an IP address so that Internet traffic sent from and directed to that computer may be directed

11

properly from its source to its destination. Most Internet service providers control a range of IP addresses. Some computers have static—that is, long-term—IP addresses, while other computers have dynamic—that is, frequently changed—IP addresses.

        d.      Internet: the Internet is a global network of computers and other electronic devices that communicate with each other. Due to the structure of the Internet, connections between devices on the Internet often cross state and international borders, even when the devices communicating with each other are in the same state.

26.      Based on my training, experience, and research, I know that Target Device 1 most likely has capabilities that allows it to serve as a smart phone, digital camera, GPS navigation device, and access the Internet, among other things. In my training and experience, examining data stored on such devices can uncover, among other things, evidence that reveals or suggests who possessed or used the device.

## ELECTRONIC STORAGE AND FORENSIC ANALYSIS

27.      Based on my knowledge, training, and experience, I know that electronic devices can store information for long periods of time. Similarly, things that have been viewed via the Internet are typically stored for some period of time on the device. This information can sometimes be recovered with forensic tools.

        a.      Forensic evidence. As further described in Attachment B, this application seeks permission to locate not only electronically stored information that might serve as direct evidence of the crimes referenced above, but also forensic evidence that establishes how Target Device 1 was used, the purpose of its use, who used it, and when. There is probable cause to believe that this forensic electronic evidence might be on Target Device 1 because:

        i.        Data on a storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file).

        ii.        Forensic evidence on a device can also indicate who has used or controlled the device. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

        iii.        A person with appropriate familiarity with how an electronic device works may, after examining this forensic evidence in its proper context, be able to draw conclusions about how electronic devices were used, the purpose of their use, who used them, and when.

        iv.        The process of identifying the exact electronically stored information on a storage medium that are necessary to draw an accurate conclusion is a dynamic process. Electronic evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer or cellular telephone is evidence may depend on other information stored on such a device, and the application of knowledge about how such a device operates. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

        v.        Further, in finding evidence of how a device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.

        b.        Nature of examination. Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit the examination of Target Device 1 consistent with the warrant. The examination may require authorities to employ techniques,

13

including but not limited to computer-assisted scans of the entire medium, that might expose many parts of the device to human inspection in order to determine whether it is evidence described by the warrant.

   c. Manner of execution. Because this warrant seeks only permission to examine devices already in law enforcement's possession, the execution of this warrant does not involve the physical intrusion onto premises. Thus, I submit there is reasonable cause for the Court to authorize execution of the warrant at any time in the day or night.

## CONCLUSION

28. I submit that this affidavit supports probable cause for a search warrant authorizing the examination of Target Device 1 described in Attachment A to seek the items described in Attachment B.

Dated at Burlington, in the District of Vermont, this 4 day of May, 2021.

Christopher May
Task Force Officer
Drug Enforcement Administration

Sworn to and subscribed before me this 4th day of May, 2021.

HON. KEVIN J. DOYLE
United States Magistrate Judge

14